*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 11a0293p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

VERNON HADDEN,

            *Plaintiff-Appellant,*

    *v.*

UNITED STATES OF AMERICA,

                *Defendant-Appellee.*

No. 09-6072

Appeal from the United States District Court
for the Western District of Kentucky at Bowling Green.
No. 08-00010—Thomas B. Russell, Chief District Judge.

Argued: October 13, 2010

Decided and Filed: November 21, 2011

Before: KETHLEDGE and WHITE, Circuit Judges; BECKWITH, District Judge.[*]

_____

**COUNSEL**

**ARGUED:** David J. Farber, PATTON BOGGS LLP, Washington, D.C., for Appellant. Daniel Tenny, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** David J. Farber, PATTON BOGGS LLP, Washington, D.C., for Appellant. Daniel Tenny, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Audrey B. Williams, SOCIAL SECURITY ADMINISTRATION, OFFICE OF GENERAL COUNSEL, Atlanta, Georgia, for Appellee. Paul Caleo, Kevin M. Larson, BURNHAM BROWN, Oakland, California, John L. Tate, STITES & HARBISON PLLC, Louisville, Kentucky, for Amicus Curiae.

       KETHLEDGE, J., delivered the opinion of the court, in which BECKWITH, D. J., joined. WHITE, J. (pp. 10–16), delivered a separate dissenting opinion.

_____

[*] The Honorable Sandra S. Beckwith, Senior United States District Judge for the Southern District of Ohio, sitting by designation.

———————

**OPINION**

———————

KETHLEDGE, Circuit Judge.  The statute that governs an issue is usually the one to rely upon in arguing it.  Here, the parties agree that the Medicare statute governs the extent to which Vernon Hadden is obligated to reimburse Medicare for certain expenses that it paid on his behalf.  Most of Hadden's arguments, however, concern different statutes with different language than the Medicare provision that applies here.  The district court thought those arguments were beside the point.  So do we; and we otherwise think that the Medicare statute itself requires Hadden to reimburse Medicare to the full extent that the government advocates.  We therefore affirm the judgment of the district court.

I.

In August 2004, Hadden was standing near a traffic circle in Kentucky when he was struck by a vehicle owned by Pennyrile Rural Electric Cooperative Corporation.  His medical bills totaled $82,036.17.  Medicare paid his bills in full, because Hadden is a Medicare beneficiary.  Hadden later sued Pennyrile, demanding compensation for all of his medical expenses, among other damages.  Pennyrile eventually paid Hadden $125,000 in exchange for a full release of his claims against it.

What happened next is the subject of this appeal.  Federal law aims to make Medicare only a "secondary payer" as to medical expenses for which some other entity (e.g., a tortfeasor) bears responsibility.  *See* 42 U.S.C. § 1395y(b)(2).  Medicare paid Hadden's expenses nonetheless, pursuant to a provision that allows it to do so if the responsible entity might not pay the expenses "promptly[.]"  *Id.* § 1395y(b)(2)(B)(i).  But that same provision gives Medicare the right to seek "reimbursement" from the responsible entity *or* the beneficiary, if the beneficiary himself later receives a payment directly from the responsible entity.  *Id.* § 1395y(b)(2)(B)(ii), (iii).  That is what happened here:  Pennyrile made a $125,000 settlement payment to Hadden, so Medicare

circled back to him and demanded reimbursement for its earlier payment of his medical expenses. After subtracting a portion of the attorneys' fees that Hadden himself had paid to obtain the settlement, *see* 42 C.F.R. § 411.37, Medicare determined that Hadden owed it $62,338.07.

That amount was likely no surprise to Hadden, since he had escrowed exactly $62,000 of his settlement money for the specific purpose of reimbursing Medicare. But he paid the $62,338.07 (plus some interest) under protest nonetheless, arguing that he should be required to reimburse Medicare for only 10%—or about $8,000—of the more than $80,000 of expenses that Medicare paid on his behalf. According to Hadden, the accident in which he was injured was primarily the fault of an unidentified motorist who had caused the Pennyrile truck to swerve into him; that motorist was responsible for 90% of Hadden's damages, with Pennyrile responsible for only 10%; and thus Pennyrile's payment of $125,000 represented only 10% of Hadden's total damages, meaning that it only compensated him for 10% of his medical expenses, or about $8,000. The remaining $117,000 or so of the settlement, Hadden says, compensated him for damages other than medical expenses (e.g., pain and suffering)—and was therefore off-limits to Medicare.

An administrative law judge took a dim view of this theory, finding that the plain language of the Medicare statute required Hadden to reimburse Medicare the full amount that Medicare had demanded. The ALJ also found that the reimbursement was not against "equity and good conscience." *See* 42 U.S.C. § 1395gg(c). The Medicare Appeals Council agreed with each of those findings. Hadden appealed this decision to the district court, which remanded the case back to the Appeals Council. The Appeals Council issued an amended decision in which it again agreed with the ALJ's findings. The district court agreed with them as well.

This appeal followed.

II.

We review de novo the district court's dismissal of Hadden's petition. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). In addition, because our decision here involves interpretation of a statute administered by a federal agency, we review the agency's interpretation under the *Chevron* standard. Under that standard, if "Congress has directly spoken to the precise question at issue" in the text of the statute, we give effect to Congress's answer without regard to any divergent answers offered by the agency or anyone else. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43 (1984). But "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id*. at 843.

The parties agree that Pennyrile's settlement payment to Hadden gives rise to an obligation on his part to reimburse Medicare. But they dispute whether that obligation is limited to the $8,000 that Hadden says represented payment for his medical expenses.

The relevant section of the Medicare statute provides:

(2) Medicare secondary payer

(B) Repayment required

(ii) Primary plans

A primary plan, *and an entity that receives payment from a primary plan, shall reimburse* the appropriate Trust Fund for any payment made by the Secretary under this subchapter with respect to an item or service *if it is demonstrated that such primary plan has or had a responsibility to make payment with respect to such item or service. . . .*

42 U.S.C. § 1395y(b)(2)(B)(ii) (emphasis added).

This subsection has additional relevant language, but we consider the quoted portion first. It is undisputed that Pennyrile is a "primary plan" and that Hadden is an

"entity that receive[d] payment from a primary plan" within the meaning of this provision. It is also undisputed that Medicare paid for $82,036.17 of medical services rendered to Hadden. Thus, under the quoted language, Hadden "shall reimburse" Medicare to the same extent that Pennyrile "had a responsibility to make payment" with respect to those services.

The key term here is "responsibility," since Hadden's obligation to reimburse Medicare for its payment of his medical expenses is coextensive with Pennyrile's responsibility to pay them. Hadden's argument, of course, is that (according to him) Pennyrile "had a responsibility to make payment" for only 10% of his medical expenses—i.e., only $8,000 of them—and that his reimbursement obligation is thus limited to the same extent. The Ninth Circuit encountered an identical argument back in 1995 and concluded that § 1395y(b)(2)(B) was silent as to whether the argument was correct. *See Zinman v. Shalala*, 67 F.3d 841, 845 (9th Cir. 1995). Hence the court turned to the agency's interpretation of the statute, under which Medicare was "entitled to full reimbursement of conditional Medicare payments when a beneficiary receives a discounted settlement from a third party." *Id.* at 846. The court easily found this interpretation to be reasonable, and thus deferred to it under *Chevron*. *Id.*

In the meantime, Congress has directly spoken to this issue—in a way highly unfavorable to Hadden. In 2003, Congress amended § 1395y(b)(2)(B)(ii) to add the language in italics below:

> A primary plan, and an entity that receives payment from a primary plan, shall reimburse the appropriate Trust Fund for any payment made by the Secretary under this subchapter with respect to an item or service if it is demonstrated that such primary plan has or had a responsibility to make payment with respect to such item or service. *A primary plan's responsibility for such payment may be demonstrated by a judgment, a payment conditioned upon the recipient's compromise, waiver, or release (whether or not there is a determination or admission of liability) of payment for items or services included in a claim against the primary plan or the primary plan's insured, or by other means.*

*Id.* (emphasis added).

The italicized language leaves no room for Hadden's argument in this appeal. As used in § 1395y(b)(2)(B)(ii), "responsibility" is no longer an undefined term into which courts might funnel their own notions (or Hadden's) of equitable apportionment. It is instead a term of art, which defines several ways in which a primary plan's "responsibility" can be demonstrated for purposes of this section. We address only one of them here: specifically, under § 1395y(b)(2)(B)(ii) as amended, if a beneficiary makes a "claim against [a] primary plan[,]" and later receives a "payment" from the plan in return for a "release" as to that claim, then the plan is deemed "responsib[le]" for payment of the "items or services included in" the claim. *Id.* Consequently, the scope of the plan's "responsibility" for the beneficiary's medical expenses—and thus of his own obligation to reimburse Medicare—is ultimately defined by the scope of *his own claim against the third party*. That is true even if the beneficiary later "compromise[s]" as to the amount owed on the claim, and even if the third party never admits liability. And thus a beneficiary cannot tell a third party that it is responsible for all of his medical expenses, on the one hand, and later tell Medicare that the same party was responsible for only 10% of them, on the other.

That is precisely what Hadden attempts to do here. In his claim against Pennyrile, he did not demand that it pay for only 10% of the medical expenses that he incurred as a result of his accident; he demanded that it pay for *all* of them. That choice has consequences—one of which is that Hadden must reimburse Medicare for those same expenses. (To respond briefly to the dissent: Section 1395y(b)(2)(B)(v) affords the Secretary broad discretion to waive Medicare's right of recovery to the extent she sees fit in a particular case.)

Hadden tries to avoid this conclusion by making arguments about statutes other than the one that applies here. Specifically, he says that, under the Medical Care Recovery Act, 42 U.S.C. § 2651(a), and the Medicaid statute, *id.* § 1396a(a)(25)—both of which are undisputedly inapposite—"the government is entitled to recover only its proportionate share of a discounted settlement." Hadden Br. at 13. And he argues at considerable length that there is "no principled reason" not to apply the same limitation

to the government's right to reimbursement under the Medicare statute. *Id.* at 18. So, in his view, we should treat all of the statutes the same.

The argument seriously misconceives our role in this case. Hadden seems to regard statutes merely as starting points, from which the courts then develop what he calls "federal common law." Reply Br. at 14. But our task in this case is not to fashion a sort of judicial string theory, under which we develop universal principles that harmonize different statutes with different language. Our task instead is to apply the words of the statute at hand. Of course, if two statutes use the same words in related contexts, the caselaw for one statute might be relevant in construing the other. But the question whether, as a policy matter, there is a principled reason to treat Medicaid beneficiaries differently from Medicare ones, is for Congress to decide. What matters for us is that the words that Congress used in the Medicare statute are materially different from the words it used in the other statutes that Hadden cites; and that is principled reason enough to interpret them differently.

The same fallacy underlies Hadden's reliance on the Supreme Court's decision in *Arkansas Department of Health and Human Services v. Ahlborn*, 547 U.S. 282 (2006). *Ahlborn* applied the Medicaid statute to strike down an Arkansas statute that automatically imposed a lien in favor of the state upon settlement payments to Medicaid beneficiaries. *Id.* at 292. Hadden asserts that the Court's decision "is grounded in federal law"—with that much we agree—and that the case "stands for the base proposition that a governmental payer is not entitled to recover the full amount of its payments if the beneficiary must settle for less than his or her total damages." Hadden Br. at 23. Stated at that level of generality, we disagree. The Supreme Court did not divine principles of universal application in *Ahlborn*. What it did, rather, was interpret the language of the Medicaid statute. That language limits the state's right (actually it is the state's obligation) to seek reimbursement from settlement proceeds paid to a Medicaid beneficiary. *See id.* at 284–85. The relevant limitation is that the state can seek reimbursement to the extent the settlement payor has "legal liability . . . to pay for care and services available under the plan[.]" 42 U.S.C. §§ 1396k(a)(1)(A),

1396a(a)(25)(A). So "liability" was the critical term there; and the Court construed it to mean that the state was limited to the portion of the settlement that, per the stipulation of the settling parties, represented compensation for medical expenses. 547 U.S. at 280–81. That is a natural reading of the term "liability," which indeed has a reasonably precise meaning in the law generally. In contrast, the critical term here is "responsibility"—which does not have a precise meaning in the law generally, though one might expect its meaning to be broader than that of "liability."

But the compelling point is that Congress specifically defined the term "responsibility" in the 2003 amendments to § 1395y(b)(2)(B)(ii). It is *that* definition, and not the Supreme Court's construction of a different term in a different statute in *Ahlborn*, that we are bound to apply in this appeal. And under the 2003 definition of "responsibility," Hadden was obligated to reimburse Medicare the full amount that it demanded of him. (The same kind of reasoning disposes of Hadden's argument that our interpretation of the Medicare statute in this case is controlled by our interpretation of the Medical Care Recovery Act in *Cockerham v. Garvin*, 768 F.2d 784 (6th Cir. 1985).)

Hadden's next argument is that the only means by which the government can enforce its right to reimbursement under § 1395y(b)(2)(B)(ii) is to bring an action under § 1395y(b)(2)(B)(iv). The latter is a subrogation provision, which Hadden says is limited by "general subrogation principles," among which his Zelig-like principle of proportionate recovery makes yet another appearance. But the argument's premise is incorrect. Clause (iv) is not the only means by which the government can enforce its reimbursement rights under clause (ii). To the contrary, the government is plainly entitled to enforce those rights under clause (iii). That section provides in relevant part: "[T]he United States may recover under this clause from any entity that has received payment from a primary plan[.]" 42 U.S.C. § 1395y(b)(2)(B)(iii). Hadden is undisputedly such an "entity." The government is therefore entitled to recover against Hadden under clause (iii), "separate and distinct" from its rights of subrogation under clause (iv). *Zinman*, 67 F.3d at 844–45; *see also Mathis v. Leavitt*, 554 F.3d 731, 733 (8th Cir. 2009) ("Medicare's right to reimbursement and [] Medicare's subrogation

rights . . . . are distinct and independent of each other"). Thus, Medicare's right to reimbursement in this case is not encumbered by any of the subrogation baggage that might (or might not) weigh down an action under clause (iv).

Finally, Hadden argues that the government was required to waive Hadden's reimbursement obligation, or at least all but $8,000 of it, on the ground that reimbursement here is "against equity and good conscience." 42 U.S.C. § 1395gg(c). In support, Hadden contends that the agency considered too narrow a range of factors and that its consideration of even those factors was "robotic." Hadden Br. at 38. The latter characterization is simply unfair—the Appeals Council gave a careful, reasoned explanation for why a waiver of reimbursement was not warranted here—and the former characterization is inaccurate. In its August 2008 decision, the Council considered a significantly broader range of factors than Hadden lets on in his brief. Those included some open-ended ones, such as "[t]he degree to which recovery or adjustment would cause undue hardship for the beneficiary[.]" Appeals Council Op. at 14 (citing the Medicare Secondary Payer Manual, ch. 7, § 50.6.5.2). Hadden's basic problem was that he presented little or no evidence of hardship as a result of the reimbursement, and that he otherwise retained almost $44,000 of the settlement proceeds after reimbursing Medicare. Suffice it to say that we have no basis to disturb the agency's determination in this regard. *See* 42 U.S.C. § 405(g).

\* \* \*

The district court's judgment is affirmed.

———————————

**DISSENT**

———————————

HELENE N. WHITE, Circuit Judge (dissenting). I respectfully dissent. The majority concludes that the usage of the word "responsibility" in the Medicare Secondary Payer Act's (MSP) recovery provision, 42 U.S.C. § 1395y(b)(2)(B)(ii), clearly and unambiguously dictates that a Medicare recipient's tort recovery from a torfeasor/primary plan is subject to the Secretary's claim for reimbursement for the entire amount of Medicare's conditional payments to healthcare providers on behalf of the recipient, without regard to whether the tort recovery included full payment for the items and services paid for by Medicare. The majority finds this clarity by equating "responsibility" with the amount that must be paid; in other words, if a primary plan is responsible to any degree with respect to an item or service for which Medicare paid, it is responsible for the entire amount Medicare paid, as is any entity to whom the primary payee made a payment in any amount.

The provision states:

> A primary plan, and an entity that receives payment from a primary plan, shall reimburse the appropriate Trust Fund for any payment made by the Secretary under this subchapter with respect to an item or service if it is demonstrated that such primary plan has or had a responsibility to make payment with respect to such item or service. *A primary plan's responsibility for such payment may be demonstrated by a judgment, a payment conditioned upon the recipient's compromise, waiver, or release (whether or not there is a determination or admission of liability) of payment for items or services included in a claim against the primary plan or the primary plan's insured, or by other means.* If reimbursement is not made to the appropriate Trust Fund before the expiration of the 60-day period that begins on the date notice of, or information related to, a primary plan's responsibility for such payment or other information is received, the Secretary may charge interest (beginning with the date on which the notice or other information is received) on the amount of the reimbursement until reimbursement is made (at a rate determined by the Secretary in accordance with regulations of the Secretary of the Treasury applicable to charges for late payments).

42 U.S.C. § 1395y(b)(2)(B)(ii) (emphasis added).

If the amended provision does, indeed, address the question as the majority contends, the consequence is that not only is the Medicare recipient's recovery subject to the Secretary's claim for reimbursement for the entire amount paid for medical services, but so too is the tortfeasor (primary plan), and health-care provider who receives any payment from the primary plan; and all three are subject to the Secretary's independent claim for double damages for the full amount paid. Further, the statute does not distinguish between settlements and judgments; thus, if the statute mandates full recovery, the Secretary's interpretation of the statute – which permits the recipient/payee to retain the part of the judgment not representing medical costs – is in violation of the express terms of the statute.

Section 1395y(b)(2)(B)(ii) is addressed to the liability of the primary plan, which in this case includes the tortfeasor. The provision also applies to "an entity that receives payment from a primary plan," which could include a Medicare insured, as in this case, or a medical provider that has received a payment. Thus, all three entities, the primary plan, the Medicare recipient and the health-care provider, are subject to the same provision. Further as noted, demonstrated responsibility includes a judgment and a settlement that includes a release.

The majority concludes that if it is demonstrated that the primary plan had a responsibility to make payment with respect to an item or service paid for by Medicare, then the primary plan or an entity receiving payment from the primary plan is liable to the Secretary for the full amount the Secretary paid with respect to the item or service, without regard to the extent of the primary plan's liability or the amount paid to the entity receiving payment from the primary plan. Having so found, the majority does not explain the statutory basis for limiting the Secretary's recovery to the settlement amount paid to the recipient by the tortfeasor. If the provision means what the majority says it means, i.e., responsibility means full responsibility for the item or service, then a tortfeasor who settles for less than the amount paid by Medicare is liable to the Secretary for the difference, regardless of the extent of the torfeasor's liability for the injuries with

respect to which the medical expenses were incurred. Consequently, if Pennyrile had paid Hadden $22,000, it would still be liable to the Secretary for the remaining $60,000. And, if Medicare had paid $250,000 in medical costs, Pennyrile would be liable to the Secretary for the full amount. And, in this case, the Secretary could have sued Pennyrile for the balance of its conditional payments as well as Hadden.[1]

Similarly, under the majority's interpretation of "responsibility," a health-care provider receiving partial payment from a torfeasor/primary plan is required to reimburse the Secretary for the entire amount received from Medicare under section 1395y(b)(2)(B)(i), the conditional payment provision, regardless of the amount received from the tortfeasor/primary plan. One might respond that in interpreting the statute, we must avoid an absurd result, and requiring the health-care provider to reimburse the Secretary in excess of the amount received is an absurd result. That may be so, but some would argue that requiring a severely injured Medicare recipient to repay the Secretary in full even if it means handing over the entire tort settlement is equally absurd.

In contrast to the majority, I conclude the MSP is silent with regard to the issue before us. The "demonstrated responsibility" clause was recently discussed in this Court's opinion in *Bio-Medical Applications of Tennessee, Inc. v. Central States Southeast & Southwest Areas Health & Welfare Fund*, 656 F.3d 277, 289-90 (6th Cir. 2011), which explained that the clause was added in response to the federal courts' rejection of the Secretary's attempts to collect from tortfeasors under section 1395y(b)(2)(B)(ii) and (iii). The provision was intended to make clear that tortfeasors are primary plans subject to the Secretary's reimbursement claims as long as their liability is demonstrated by some means, including by judgment or settlement. I do not read this amendment as addressing the amount of reimbursement due. It is silent on the issue and does not purport to address it. Historically, Medicare was primary to all coverage except worker's compensation coverage. Gradually, Congress made other forms of medical coverage primary. With the exception of liability insurance, the basis

---

[1]Any indemnity agreement that might be included in the tortfeasor's settlement agreement with the injured party is beside the point.

of liability for all sources of payment primary to Medicare was contractual, and the extent of the liability was based on contract, not on the amount Medicare happened to pay.

The concept of demonstrated responsibility arises from the redrafting of the statute to accommodate the Congressional intent that tortfeasors be regarded as primary payors. When tortfeasors pay, Medicare must be reimbursed. It does not follow that Medicare must be reimbursed in an amount greater than it would be reimbursed if the primary payor were a health-care insurance company. Nor does it follow that a tort victim insured by Medicare, who has paid a premium for that coverage, should receive a smaller share of a tort-recovery, or none at all, because the person happened to be insured by Medicare, rather than another health-insurance provider with a subrogation clause. These observations are not addressed to public policy; rather they are addressed to the history of Medicare in the context that the MPA does not speak to the amount of reimbursement.

*Chevron* deference is not the answer to the MPA's silence. When reviewing an agency's interpretation of a statute that it administers, courts typically use the two-step process outlined in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Under this framework, if "Congress has directly spoken to the precise question at issue[,] . . . the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43. By contrast, if "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. An agency's interpretation of a statute, as expressed in a regulation, is entitled to deference unless it is "arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844.

Medicare regulations interpret 42 U.S.C. § 1395y(b)(2)(B)(ii) to allow CMS to obtain full reimbursement of conditional payments from a judgment or settlement obtained by the beneficiary against his or her tortfeasor(s). *See* 42 C.F.R. §§ 411.24(c), 411.37(c). As observed by the majority, in *Zinman v. Shalala*, 67 F.3d 841, 843 (9th Cir.

1995), the Ninth Circuit upheld the regulations as "a rational construction of the statute[, which] is also consistent with the statute's purpose." I do not find this single case persuasive. Further, the case preceded the enactment of the language at issue here.

The instant case further differs from *Zinman* in that Hadden does not challenge the Medicare regulations, but CMS's policy to apply principles of equitable allocation only in cases where the beneficiary's claim for damages is adjudicated on the merits. This rule is contained in the MSP Manual, which does not command the same level of deference as agency regulations. As the Supreme Court explained in *Christensen v. Harris County*,

> [Agency] Interpretations [of an ambiguous statute] such as those in opinion letters -- like interpretations contained in policy statements, *agency manuals*, and enforcement guidelines, all of which lack the force of law--do not warrant *Chevron*-style deference. Instead, interpretations contained in formats such as opinion letters are "entitled to respect" under our decision in *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 [] (1944), but only to the extent that those interpretations have the "power to persuade," *ibid*.

529 U.S. 576, 587 (2000) (emphasis added) (other citations omitted); *see also Battle Creek Health Sys. v. Leavitt*, 498 F.3d 401, 409 (6th Cir. 2007). The MSP Manual is not the product of formal, notice-and-comment rulemaking and, as such, the deference it enjoys hinges on its ability to persuade this Panel of the advantage of treating discounted settlements differently from adjudications on the merits. *See Bank of N.Y. v. Janowick*, 470 F.3d 264, 269 (6th Cir. 2006).

CMS's arguments in support of its policy are largely culled from the Ninth Circuit's opinion in *Zinman*. In particular, CMS argues, "[a]pportionment of Medicare's recovery in tort cases would either require a factfinding process to determine actual damages or would place Medicare at the mercy of a victim's or personal injury attorney's estimate of damages." *Zinman*, 67 F.3d at 846 (quoted in CMS Br. at 12-13). There is undoubtedly a risk that settling parties in tort claims that involve medical expenses paid by Medicare could manipulate the proportions of each category of

damages and leave Medicare with the smallest slice of the pie.[2]  However, the Supreme Court considered and unanimously rejected this very argument in *Ahlborn*, stating:

> ADHS' and the United States' alternative argument that a rule of full reimbursement is needed generally to avoid the risk of settlement manipulation is more colorable, but ultimately also unpersuasive.  The issue is not, of course, squarely presented here; ADHS has stipulated that only $35,581.47 of Ahlborn's settlement proceeds properly are designated as payments for medical costs.  Even in the absence of such a postsettlement agreement, though, the risk that parties to a tort suit will allocate away the State's interest can be avoided either by obtaining the State's advance agreement to an allocation or, if necessary, by submitting the matter to a court for decision.  For just as there are risks in underestimating the value of readily calculable damages in settlement negotiations, so *also is there a countervailing concern that a rule of absolute priority might preclude settlement in a large number of cases*, and be unfair to the recipient in others.

*Arkansas Dep't of Health & Human Servs. v. Ahlborn*, 547 U.S. 282, 288 (2006) (footnotes omitted) (emphasis added).  The majority correctly observes that *Ahlborn* involves a different statute with different terminology.  However, that distinction has no bearing on the Supreme Court's reasoning in this regard, which addresses the asserted policy behind the distinction between amounts recovered through settlement and amounts recovered after trial, the same distinction drawn in the Manual.

---

[2]Medicare's position in this case contradicts its behavior in other secondary-payer claims.  For instance, CMS regularly reviews and approves settlements in workers' compensation cases involving future medical expenses.  Settlements and awards in workers' compensation cases frequently include a provision for future medical expenses, *i.e.*, expenses incurred after the settlement or award is finalized.  The MSP makes Medicare the secondary payer for such future expenses as well, and CMS has the authority to disregard a settlement if it appears to shift the costs of the injured's future treatment onto Medicare.  *See generally* Norma S. Schmidt, Note: *The King Kong Contingent: Should the Medicare Secondary Payer Statute Reach to Future Medical Expenses in Personal Injury Cases*, 68 U. Pitt. L. Rev. 469, 476-78 (Winter 2006).  The parties to a workers' compensation claim typically enter into a Medicare Set-aside Arrangement ("MSA") in which "a portion of the settlement is 'set aside' and applied specifically to future medical expenses which would otherwise be covered by Medicare."  *Id.* at 477-78.  Before finalizing their settlement, the parties can request that CMS review and approve the MSA amount.  *Id.* at 478.  This system "eliminates the risk of a future denial of Medicare benefits, and assures the parties that Medicare's interests have been reasonably considered."  *Id.*  MSAs have become "standard practice for addressing Medicare's interests in workers' compensation settlements."  *Id.* (internal quotation marks and citation omitted).  This system has its drawbacks, notably the difficulty of estimating future healthcare expenses and the added delay of obtaining CMS's approval of MSA proposals before settlements can be finalized, but CMS has taken steps to make the MSA-approval process more efficient.  *Id.* at 482.  In any case, this example shows that CMS need not be "at the mercy" of the victim's estimate of his damages in cases like this one.

Further, notwithstanding that a different statute is involved, the Court's discussion in *Ahlborn* sheds light on the Court's view of the arguments put forth by the *Zinman* court in support of the Regulations.  The Court recognized the negative effect of Arkansas's policy for recovering Medicaid costs on settlements between beneficiaries and tortfeasors. The policy at issue here similarly discourages settlements and may ultimately hinder CMS's efforts to recover conditional Medicare payments.  *See generally* Rick Swedloff, *Can't Settle, Can't Sue:  How Congress Stole Tort Remedies from Medicare Beneficiaries*, 41 Akron L. Rev. 557, 599-602 (2008); Nicole Miklos, Note:  *Giving an Inch, Then Taking a Mile:  How the Government's Unrestricted Recovery of Conditional Medicare Payments Destroys Plaintiffs' Chances at Compensation Through the Tort System*, 84 St. John's L. Rev. 305 (Winter 2010).